# STERNS & WEINROTH
A PROFESSIONAL CORPORATION
COUNSELLORS AT LAW
50 WEST STATE STREET
SUITE 1400
P.O. BOX 1298
TRENTON, NEW JERSEY 08607-1298
(609) 392-2100
FACSIMILE
(609) 392-7956
WWW.STERNSLAW.COM

Member, NJ, NY and GA Bars
Certified by the Supreme Court of
New Jersey as a Civil Trial Attorney
Michael A. Spero: (609) 989-5009
e-mail: mspero@sternslaw.com

File No.: 51170-55

September 15, 2011

**Via U.S. Mail and Facsimile: 212-805-6382**
Honorable Victor Marrero
United States Courthouse
500 Pearl Street, Courtroom 20B
New York, NY 10007

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/11

Re:  Riviera Finance of Texas, Inc. vs. Capgemini U.S., LLC, 10 Civ. 5489 (VM)

Dear Judge Marrero:

We represent Riviera Finance of Texas, Inc. ("Riviera"). For the reasons set forth in detail below, Riviera is entitled to summary judgment as a matter of law and Capgemini's motion should be denied.

**I.    Introduction:** The relationships in this case bear review in order to appreciate the concepts at play. EC Manage ("EC") and Capgemini entered into an agreement ("original agreement"), whereby EC was to provide to Capgemini contractors for technology consulting. Pursuant to the original agreement, Capgemini would pay EC directly, and EC would pay the contractors. On October 2, 2009, EC entered into a factoring agreement with Riviera, whereby EC assigned the payments due to it from Capgemini to Riviera. It is undisputed that Riviera and EC properly notified Capgemini of the factoring agreement and assignment of payments, and that Capgemini accepted that assignment.

By way of background, "factoring in modern commercial practice is understood to refer to the purchase of accounts receivable from a business by a "factor" who thereby assumes the risk of loss in return for some agreed discount. Indeed, the factor has emerged primarily as a financier, often a finance company or similar institution, which provides its clients . . . with needed working capital and other financial assistance by purchasing their accounts receivable." Systran Financial Services Corp. v. Giant Cement Holdings, Inc., 252 F.Supp.2d 500, 504 (N.D. Ohio 2003) (quoting 32 Am.Jur.2d 6 (1995). Factoring agreements are governed by Article 9 of the U.C.C. Id. at 505.

On December 2, 2009, two months after the notice of assignment, EC and Capgemini entered into a subsequent agreement, where EC agreed essentially to use all monies that Capgemini paid to EC

{00444654;v1}1

Honorable Victor Marrero
September 15, 2011
Page 2

to pay the contractors ("subsequent agreement"), and changed additional terms of the original agreement. Capgemini collapses these two agreements and alleges that EC did not honor "the agreement."[1]

In the case at bar, Riviera is seeking payment from Capgemini pursuant to the factoring agreement. In defense of making these payments, Capgemini claims that it is relieved from paying this money to Riviera because EC allegedly breached the original agreement and the subsequent agreement between EC and Capgemini, causing alleged damages to Capgemini.

These arguments give rise to the concept of the two "debts" at play in this case. On one hand, Riviera asserts that Capgemini owes a "debt" to Riviera, arising from the accounts receivable assigned to Riviera from EC. This "debt" is the basis of the instant suit. On the other hand, Capgemini claims that EC owes it a "debt," for the damages it claims it sustained when EC allegedly did not pay the contractors. This "debt" is the basis for Capgemini's suit against EC (Capgemini U.S. LLC v. EC Manage, Inc., 10 Civ. 2486 (GBD)(HBP)).[2] Capgemini's position is that these two "debts" cancel out each other, and it should be relieved from paying Riviera on this basis.

II.     **Recoupment versus Set-off:** The differences between recoupment and set-off are distinct, and defendant has conflated these defenses in its letters to Your Honor. The difference between the two is pivotal to the case at bar.

As set forth in Riviera's letter of July 15, 2011, "[w]hile both defenses share the fundamental concept of the reciprocal cancelling of debts, the key difference between the two is that recoupment is when the debts arise from the same transaction, while set-off is when the debts arise from different transactions." See Riviera's letter of July 15, 2011 attached hereto as Exhibit A. See also Atlantic City Hosp. v. Finkle, 101 N.J. Super. 532 (Ch. Div. 1970) (defining set-off as "a claim arising out of a completely independent and unrelated transaction"); Beneficial Finance Co. v. Swaggerty, 86 N.J. 602 (1981) (referring to recoupment as an affirmative defense that may be asserted by a defendant whose claim is based upon the same transaction that is the subject of the plaintiff's suit).

Crucially, a recoupment defense explicitly is permitted against an assignee, under the relevant governing portions of the U.C.C. See U.C.C. §12A:9-404(a)(1). That is, if the two "debts" arise from the same transaction, Capgemini may use recoupment as a defense to offset against paying monies it owes to Riviera. On the other hand, the defense of set-off is governed by U.C.C. §12A:9-404(a)(2), wherein the defense is available <u>only to the extent that it accrued *before* the account debtor [Capgemini] received notification of the assignment</u> (October 2, 2009).

---

[1] In its letter of August 26, 2011, Capgemini claims that Riviera does not dispute that EC breached its agreement(s) with Capgemini. Riviera cannot speak for a third party and has no independent knowledge of whether EC did or did not breach any agreement, and therefore takes no position on this issue. Such alleged breach is irrelevant here, where Capgemini's obligation to pay Riviera is independent from its remedies as against EC for any alleged breach.

[2] Permitting Capgemini to recover against EC, as well as use the same alleged injury as an offset in the instant matter would create an unjust enrichment to Capgemini in the form of a double recovery for the same alleged injury. Capgemini should be estopped from doing so.

{00444654;v1}2

Honorable Victor Marrero
September 15, 2011
Page 3

Here, it is an undisputed that Capgemini's claimed defense accrued <u>after</u> it received notice of the factoring agreement/assignment from EC to Riviera. (See, e.g., letter of Gerald D. Silver, August 26, 2011, page 2, admitting that Capgemini received notification of the factoring agreement/assignment on October 2, 2009, but did not advise Riviera of the alleged problem with EC's performance under the original agreement until December 18, 2009). Therefore, under the U.C.C., Capgemini may not pursue a set-off defense because this defense accrued <u>after</u> proper notice of the assignment from EC to Riviera. Thus, the only defense Capgemini is left with is recoupment, which is permitted under the U.C.C., regardless of time of accrual, to the extent the defense arose from the <u>same transaction</u>. <u>The crucial issue in this case for purposes of summary judgment, is whether the two "debts" arise from the same transaction. As a matter of law and public policy, they do not.</u>

**III.     Capgemini's defense arises from a different transaction:** In support of its argument that it is relieved from paying Riviera monies owed, Capgemini argues that EC breached "the Agreement" between Capgemini and EC. Capgemini argues that because Riviera "stands in the shoes" of EC, Capgemini need not pay Riviera, pursuant to a defense of recoupment—the mutual offsetting of debts. Under the U.C.C., §12A:9-404, in order to prevail on a theory of recoupment, Capgemini must demonstrate that its defenses against paying Riviera arose from the <u>same transaction</u> as the underlying original agreement between EC and Capgemini. There are multiple problems, however, with Capgemini's argument that the two "debts" arise from the same transaction.

First, in referring to "the Agreement," Capgemini conflates two apparent agreements. The first is the Agency Agreement dated October 1, 2007 between Capgemini and EC (Ex. 1 to Capgemini's August 26, 2011 letter). The second is a "letter agreement" dated December 2, 2009. (Ex. 7 to Capgemini's August 20, 2011 letter). To the extent that Capgemini's claims are based on the letter agreement, they are impermissible against Riviera. Capgemini cannot prevail on a set-off defense based on this letter agreement because it is undisputed that the letter agreement was executed <u>after</u> Capgemini received the notice of assignment from EC to Riviera. See §12A:9-404(a)(2). Likewise, Capgemini cannot prevail on a recoupment defense based on this letter agreement because the letter agreement was a second, separate, subsequent agreement between EC and Capgemini and thus recoupment (which applies only to defenses arising from the same transaction) does not apply.

Second, Capgemini cannot claim that its defense against paying Riviera arises from the same transaction as the underlying original agreement between EC and Capgemini because Capgemini's claimed injuries are based on its own self-help—not based on any harm actually resulting from the original agreement. In fact, Capgemini was not liable for EC's alleged breach; if the contractors had sued Capgemini seeking payment, Capgemini's defense clearly would have been that the contractors contracted directly with EC and there was no privity between the contractors and Capgemini. See, e.g., Article 7 of original agreement, attached as Exhibit 1 to Capgemini's letter of August 26, 2011, outlining relationship between Capgemini and the contractors. To be sure, the original agreement required EC to "pay the wages of [the contractors] from [EC's] own accounts." Rather, and as set forth in Riviera's July 15, 2011 letter to Your Honor, Capgemini made the "business decision" to exercise self help and pay the contractors. Capgemini's former-CFO testified, and its most recent submission to Your Honor reiterates, that Capgemini actively solicited the contractors to supply Capgemini with details of alleged missing

Honorable Victor Marrero
September 15, 2011
Page 4

payments.[3] Capgemini suffered no losses as a result of EC's alleged failure to timely pay the vendors—they lost no clients, which was their claimed concern. See Hymer Transcript, 47:17, attached hereto as Exhibit B. Neither EC, nor Riviera in EC's shoes, is responsible for this decision. As a matter of law, Capgemini's business decision to seek self help has no legal bearing on EC or Riviera, and cannot be said to arise from the same transaction that underlies Riviera's right to payment from Capgemini.

Case law supports this view that Capgemini's claimed defense does not arise from the same transaction as the underlying EC/ Capgemini agreement. For example, the court in Novartis Animal Health US, Inc. v. Earle Palmer Brown, LLC, 424 F.Supp.2d 1358 (N.D. Ga. 2006) addressed a situation with similar relationships between the parties as found in the case at bar. There, Novartis Animal Health US, Inc. ("Novartis") and Earl Palmer Brown, LLC ("EPB) entered into an agreement for a television advertising campaign. EPB issued three invoices to Novartis totaling $9.4 million. Meanwhile EPB's parent entered into a factoring agreement with UPS Capital Corporation ("UPSC"), assigning this account receivable to UPSC. Like EC is alleged to have failed to pay its contractors in the case at bar, in Novartis, EPB did not pay the bills of its media-company vendors. Some of these media companies sued EPB and Novartis. Ultimately the court held that Novartis could not assert a claim against UPSC, the factor/ assignee. In so holding, the court held that the Novartis' obligation to pay the $9.4 million was "due by virtue of its own agreement"[4] and that "there was a valid, subsisting matured obligation for payment which could properly be assigned to [the factor] UPSC." Id., 1364. Here too, Capgemini's obligation to pay Riviera is a separate obligation from its claims regarding EC's alleged breach of their underlying agreement.

For all these reasons, Capgemini cannot prove that its defense against paying Riviera arose from the same transaction as the underlying original agreement between EC and Capgemini, and thus, the recoupment defense is unavailable to Capgemini, because by definition, the recoupment defense is when the defense against payment arises from the same transaction as the affirmative claim.

**IV.  Public Policy Favors Riviera's Recovery Against Capgemini:** If Capgemini prevails and is permitted to deny payment to Riviera on the basis claimed – namely that the assignor EC breached a contract with Capgemini, it will effectually force Riviera into the position of acting as a de facto insurer

---

[3] It is noteworthy that in the bankruptcy context, Capgemini's conduct is prohibited. See § 553(a)(2) and Alan N. Resnick, Henry J. Sommer, Eds. In Chief, Colier on Bankruptcy, 16th Ed., ¶553.03[5][a] This seminal bankruptcy treatise explains, "[w]ithout the [relevant bankruptcy law restrictions], any entity that owed a debt to a debtor ... might simply purchase one or more claims against the debtor after the debtor files for bankruptcy relief, in order to acquire a "claim" for the purpose of escaping the debt by offsetting the acquired "claim" against the preexisting "debt." Such is not permitted. This is precisely what Capgemini has attempted to do here, albeit not in a bankruptcy context, by "purchasing" the contractor's potential claims against EC, in order to use such claims as an offset against paying the monies owed to Riviera, which are entirely independent of the contractors' potential claims against EC.

[4] One fact in the Novartis case that is not on point to our case is that Novartis argued that the invoices at issue could not be factored because they were advance billings for media placements that had not yet occurred. The court held that because the parties had agreed to the advanced billing schedule, the claims for payment had matured and were the proper subject of UPC's claims.

to the contract between Capgemini and EC. Such a result is contrary to public policy and law. For example, the Court in the seminal case on this topic, Michelin Tires, addressed this exact concern:

> In essence, Michelin [the account debtor] contends that its restitution claim [against First National Bank, the assignee] arises from its contract with JCC [the assignor], and that §9-318(1)(a) [the precursor to §9-404] accordingly permits Michelin to recover from FNB as JCC's assignee. . . . [T]he theory rests upon a construction of §9-318 that would impose full contract liability on assignees of contract rights. Under this view, a bank taking an assignment of contract rights as security for a loan would also receive as "security" a delegation of duties under the contract and the risk of being held liable on the contract in place of its borrower. We do not believe it was the intent . . . to create such a result.
>
> By making the bank a surety, not only will accounts receivable financing be discouraged, but transaction costs will undoubtedly increase for everyone. In order to protect themselves, FNB would essentially be forced to undertake the precautionary measures that Michelin attempted to use, independent observation by an intermediary and sworn certifications by the assignor. <u>FNB would have to supervise every construction site where its funds were involved to ensure performance and payment.</u>

<u>Michelin Tires (Canada) Ltd. V. First Nat. Bank of Boston</u>, 666 F. 2d 673, 677 (1981)(emphasis supplied). In the case at bar, Capgemini concedes it knew of the problem with EC's performance of the original agreement, but nonetheless confirmed to Riviera the validity of the accounts receivable that Riviera funded, in advance of Riviera's opting to do so. All Riviera's fundings were complete prior to December 18, 2009, the date Capgemini first informed Riviera of the alleged problem with EC's performance. Despite this, Capgemini has argued that it has no duty to Riviera, and in fact, Riviera could have confirmed the accounts directly with EC. The Court's ruling in <u>Michelin</u>, however, explicitly holds that such is not the burden on the assignee/ factor. Rather, the court held that to require an assignee/ factor to monitor the activities of their assignor would require "precautionary measures" and "independent observations" and a level of supervision that would be nonsensical. Riviera urges the Court in the instant case to consider these broad industry implications of ruling in Capgemini's favor.

Factoring serves an important function in society. The court in <u>In re Mortgages, LTD. v Manness et al.</u>, 405 B.R. 669, 673 (D. AZ. 2009) also addressed this issue. There, the court held that a bare assignment of a contract does not imply an assumption of duties, especially "in the circumstance where the assignment is for purposes of financing . . . [because] an important policy underlying both the Restatement rule [of implied delegation of duties in an assigned contract] and [U.C.C.] § 9-404 was to "not twist the 'precarious security' of an assignee into potential liability for this assignor's breach" because "by making the bank a surety, not only will accounts receivable financing be discouraged, but transaction costs will undoubtedly increase for everyone." (citing <u>Michelin Tires</u>, supra 666 F.2d 678).

Respectfully submitted,

Michael A. Spero

cc: Gerald D. Silver, Esq. (Via Facsimile: 647-710-5260)
    Riviera Finance of Texas, Inc.

{00444654;v1}

The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by Plaintiff.

SO ORDERED.

9-16-11
DATE    VICTOR MARRERO, U.S.D.J.

# EXHIBIT A

SEP. 15. 2010 2:28PM STERNS & WEINROTH Case 2:10-cv-05489-VM Document 14 Filed 09/19/11 Page 6 of 11 NO. 875 P. 7

{00290319;v1}

# STERNS & WEINROTH
### A PROFESSIONAL CORPORATION
## COUNSELLORS AT LAW
50 WEST STATE STREET
SUITE 1400
P.O. BOX 1298
TRENTON, NEW JERSEY 08607-1298
(609) 392-2100
FACSIMILE
(609) 392-7956
WWW.STERNSLAW.COM

Member, NJ, NY and GA Bars
Certified by the Supreme Court of
New Jersey as a Civil Trial Attorney
Michael A. Spero: (609) 989-5009
e-mail: mspero@sternslaw.com

File No.: 51170-55

July 15, 2011

**Via Facsimile: 212-805-6382**
Honorable Victor Marrero
United States Courthouse
500 Pearl Street, Courtroom 20B
New York, NY 10007

The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by Plaintiff.

SO ORDERED.

7-15-11
DATE    VICTOR MARRERO, U.S.D.J.

Re:    Riviera Finance of Texas, Inc. vs. Capgemini U.S., LLC, 10 Civ. 5489 (VM)

Dear Judge Marrero:

We represent Riviera Finance of Texas, Inc. ("Riviera") in the above-referenced matter and write pursuant to Your Honor's request for a letter not to exceed three pages outlining our anticipated summary judgment motion. There is no disputed material fact in this matter, and as set forth in detail below, Riviera is entitled to summary judgment as a matter of law.

**I. Introduction** As an initial matter, the letter submitted by Capgemini U.S. LLC ("Capgemini") suffers from conflating two distinct concepts: recoupment and setoff. Whether an intentional attempt to argue each defense in the alternate, or unintentional, this collapsing of the two defenses confuses the facts and, as a matter of law, prevents Capgemini from an award of summary judgment.

While both defenses share the fundamental concept of the reciprocal canceling of debts, the key difference between the two is that recoupment is when the debts arise from the same transaction, while setoff is when the debts arise from different transactions. There is no doubt that Capgemini's claimed defense against paying Riviera sounds in setoff, because Capgemini's "business decision" to pay EC Manage's vendors arose separate and distinct from the underlying transaction between Capgemini and EC Manage. Deposition Transcript of Richard Hymer, ("Hymer Trans."), 62:10 and 99:10. To hold otherwise would elevate debt owed to the vendors (if any) from unsecured to secured, unjustly reward Capgemini's self-help outside the legal system, and cause a result that is contrary to well-established law.

**II. Statement of Relevant Facts** For the sake of brevity, Riviera relies on the Facts set forth by Capgemini in its letter of July 1, 2011. In addition, the following undisputed facts and timeline bear noting: (1) As a matter of practice and in the case at bar, Riviera does not (and did not) fund any

{00430171;v1}

Honorable Victor Marrero
July 15, 2011
Page 2

accounts receivable until after each is confirmed as valid by the debtor, (in this case, Capgemini). (2) Capgemini's former-CFO testified that Capgemini knew of EC Manage's failure to pay some vendors as early as September, 2009. Hymer Trans., 47:9 (3) Riviera took assignment of EC Manage's accounts receivable on October 2, 2009 and notified Capgemini of the same. The Notice specifically stated, "if there are any questions concerning your billing, or claims or offsets, affecting the accounts, please call RIVIERA . . . ." Capgemini's former-CFO testified that Capgemini accepted the assignment. (4) Capgemini confirmed the validity of each and every invoice that Riviera purchased from EC, prior to the funding, and never once informed Riviera that Capgemini had placed an account hold on payments to EC Manage (or its assignee), until all of Riviera's fundings to EC Manage had been made (after December 10, 2009). (5) Capgemini's former-CFO testified that Capgemini's unilateral decision to seek self help and pay EC Manage's vendors—notably vendors with whom Capgemini was not in privity of contract and had no legal obligation to pay—was a "business decision." That is to say, Capgemini's decision to do so was outside and completely separate from the underlying servicing contract between Capgemini and EC Manage, and cannot be considered the "same transaction" for any purposes.

### III. Legal Argument
   **a. Capgemini cannot avail itself of the defenses of setoff or recoupment in this action.**

U.C.C. 12A-9-404 governs the "rights acquired by assignee" and "claims and defenses against assignee." It provides, in relevant part, that an assignee's rights are subject to the following defenses: "(a)(1) all terms of the agreement between the account debtor [in this case, Capgemini] and assignor [EC Manage] and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and (a)(2) any other defense or claim of the account debtor [Capgemini] against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee."

Capgemini cannot claim with a straight face that it has a right to recoupment as set forth in section (a)(1), because its payments to EC Manage's vendors did not arise from the "same transaction" as its original contract with EC Manage. Rather, Capgemini made the "business decision" to exercise self help and pay those vendors.[1] Neither EC Manage, nor Riviera in EC's shoes, is responsible for this decision. Indeed, as a matter of law, Capgemini's decision to pay those vendors has no legal bearing on EC Manage or Riviera because that decision has no basis in the original Capgemini-EC Manage servicing contract.

Capgemini has attempted to circumvent the laws of secured transactions by seeking its own self help. Normally, any claims from vendors as against EC Manage would be unsecured claims. On the

---

[1] Capgemini's former-CFO testified that Capgemini actively solicited the contractors to supply Capgemini with details of alleged missing payments. He further testified that he knew of no lawsuits from any of these vendors. Capgemini suffered no losses as a result of EC Manage's failure to timely pay the vendors—they lost no clients whatsoever, which was their claimed concern. Capgemini even received a notice of assignment prepared by Capgemini from each contractor for any claim it may have had as against EC Manage. These facts further demonstrate just how "outside" these alleged claims are from the underlying Capgemini-EC Manage servicing contract.

{00430171;v1}

Honorable Victor Marrero
July 15, 2011
Page 3

contrary, Riviera's claims against Capgemini are secured claims. It is black letter law that secured claims take priority to unsecured claims. Capgemini's attempt to pay off the vendors and use those "claims" against EC (and Riviera in EC's shoes), as a right to recoupment is contrary to the law of secured transactions. Only obligations sanctioned by the legislature for special lien protection (such as motor vehicle and construction) are entitled to self help type remedies. Allowing Capgemini to adjudicate obligations owed by EC to independent contractors forces Riviera to become a de facto insurance policy for those independent contractors' potential claims.

Capgemini likewise has no right to a setoff defense because any claims it would assert against Riviera for payments to the vendors crucially, and undisputedly, arose *after* it received notice of EC Manage's assignment to Riviera. U.C.C. § 9-404(a)(2) provides for defenses sounding in setoff (that is, defenses arising from separate transactions as is the case here) only if those claims arise *before* the notice of assignment. The statute is clear on its face. Because Capgemini's payments to vendors occurred *after* it received and accepted the notice of assignment, no further argument is necessary.

### b. Capgemini should be estopped from withholding payment on accounts that it previously confirmed as valid and owing.

Capgemini's argument further suffers from its desire to "have it both ways." On one hand, Capgemini argues that Riviera stands in the shoes of EC Manage in this transaction and that is the end of the inquiry. On the other hand, however, Capgemini argues that it owes no duties to Riviera because it was not in privity of contract with Riviera. This should not stand. Riviera, as assignee of EC Manage, is entitled, to the covenant of good faith and fair dealing that is implied in any contract.

As discussed, *supra*, Capgemini confirmed the validity of every account receivable that Riviera purchased. Riviera relied on such representations when it purchased the accounts from EC, and had Riviera properly been notified by Capgemini as instructed on the Notice of Assignment, Riviera would not have purchased the accounts and been injured.

### c. The cases cited by Capgemini in support of summary judgment are inapposite to the matter at bar

The cases cited by Capgemini in support of its anticipated summary judgment motion are inapposite to the case at bar. The law relied up on by Capgemini in the Ford Motor and the M.F. Hickey Co. cases address situations where the defenses are related to the *same transaction*, which, as discussed, is not so here. Moreover, Ford Motor is not on point because it does not address U.C.C. § 9-404, which governs this dispute. The Gateway National Bank case supports Riviera, not Capgemini, for the reasons outlined above.

Respectfully submitted,

*Michael A. Spero*
Michael A. Spero

cc: Gerald D. Silver, Esq. (Via Facsimile: 647-710-5260)
Riviera Finance of Texas, Inc.

{00430171;v1}

# EXHIBIT B

SEP. 15. 2011 2:23PM Case 3:10-cv-05489-WME Document 14  Filed 09/19/11  Page 10 of 11  NO. 275  P. 11

{00290319;v1}

# RICHARD HYMER

Page 46

1 the outsourcing team, it's very possible that
2 you could have different ways of doing things.
3 But if you're using a common shared service
4 center, I would have thought they would have
5 standardized this.
6    Q.   To your knowledge, did Capgemini
7 ever require proof of payment from EC Manage to
8 its contractors?
9    A.   We did not require it.
10    Q.   At no time?
11    A.   At no time that I'm aware of.
12    Q.   By the way, do you know, does
13 Capgemini today do business with TPX?
14    A.   I don't recognize the company.
15    Q.   Do you know why Capgemini never
16 required proof of payment by EC Manage?
17    A.   It was -- I don't think that we had
18 really ever run into significant issues before
19 where there had been a lack of payment.
20       When we got into the middle of
21 this, we struggled trying to understand what the
22 exposure was, meaning we had no -- short of
23 accepting EC Manage's word, or word that was
24 coming in from the field directly from the
25 contractors, we had no other information that

Page 47

1 would tell us who had been paid; who hadn't been
2 paid. And, therefore, it was difficult to
3 understand where the next problem would occur,
4 what account it would be in, or the magnitude of
5 the lack of payment.
6    Q.   Was there a realization, at some
7 point, that Capgemini was doing business with a
8 vendor that was financially in trouble?
9    A.   I think that awareness became -- we
10 didn't have that awareness until probably late
11 2009 when we started to have a much better
12 understanding of the magnitude of the unpaid
13 invoices.
14    Q.   Did Capgemini lose any contracts
15 with its clients? In other words, did a client
16 cancel a contract because of this problem?
17    A.   I'm not aware we lost any
18 contracts.
19    Q.   Is there any documented evidence,
20 that you are aware of, to confirm the fact that
21 EC Manage was not paying contractors, or was
22 everything verbal?
23    A.   There were E-mails that we received
24 either from the field -- from our own
25 individuals, our VPs, managers, telling us what

Page 48

1 the contractors had said. We had a process in
2 place where we would ask that contractor to send
3 us an E-mail and detail the period of time and
4 the dollar value. And then we would try to
5 validate it. And there was a review process
6 that we would go through to make a decision as
7 to whether we were going to pay that person
8 independently.
9    Q.   When did that first start, asking
10 selected contractors to send E-mails?
11    A.   I don't remember the exact date,
12 but clearly it was ongoing in the November time
13 frame. I just don't remember if it was also
14 ongoing in October or not.
15       At some point, as the more feedback
16 came in and there was a greater volume of
17 feedback that contractors were not being paid,
18 we, you know, my memory -- you know, from my
19 memory, we waited two or three weeks to see --
20 you know, to sort of accumulate information to
21 try to understand how big the problem was.
22       And then there was a decision made
23 that I was actively involved in, in determining
24 whether we were going to pay the individuals
25 directly and what -- sort of what angles we

Page 49

1 would use to determine if we were paying
2 somebody.
3    Q.   If I asked you this before, I
4 apologize. But when was the first time that you
5 learned of Riviera's involvement?
6       MR. SILVER: You did ask before, so
7 let me just object to being asked and answered.
8       But you can answer it again.
9    A.   I remember in either a conversation
10 with Arvind, or my contracting team, that the
11 receivables had, in fact, been factored, but I
12 don't remember the date. It was in that
13 October, November time frame.
14    Q.   Do you recall any discussion with
15 Mr. Kumar having to do with notification to
16 Riviera of this problem?
17    A.   No.
18    Q.   Never came up?
19    A.   Never came up.
20    Q.   It was something that you never
21 considered?
22       MR. SILVER: Objection to form.
23       You could answer, if you
24 understand.
25    A.   It was not something I considered.

13 (Pages 46 - 49)