UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
RIVIERA FINANCE OF TEXAS, INC.,  :
                                  :    10 Civ. 5489 (VM)
             Plaintiff,     :
                                    :
    -against-             :    **DECISION AND ORDER**
                                    :
CAPGEMINI U.S., LLC,         :
                                    :
             Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Riviera Finance of Texas, Inc. ("Riviera") brings this action against defendant Capgemini U.S., LLC ("Capgemini") advancing claims of breach of contract, book account and unjust enrichment. Riviera and Capgemini have each moved for summary judgment (see Docket Nos. 10, 11) and have submitted several letter briefs on disputed issues of law. Because there is no dispute as to any material fact and Riviera is entitled to judgment in its favor as a matter of law for the reasons discussed below, the Court GRANTS Riviera's motion and DENIES that of Capgemini.

## I. BACKGROUND[1]

Capgemini is an information technology services and consulting company located in New York City. On October 1, 2007, Capgemini entered into a services contract (the

---

[1]    The Court derives the factual summary herein from the multiple letter briefs submitted by each party and the exhibits and affidavits attached thereto. Except where specifically noted, no further references to these sources will be made.

"Original Agreement") with EC Manage, Inc. ("EC") under which EC was to pay technology contractors working for Capgemini's clients.   Per the terms of the Original Agreement, Capgemini was to pay EC directly and EC, in turn, was responsible for compensating the contractors.

Two years later, on October 2, 2009, EC entered into a factoring agreement with Riviera (the "Factoring Agreement").  Under the Factoring Agreement, EC assigned to Riviera its right to receive from Capgemini payments owed to EC under the Original Agreement.   EC and Riviera sent written notification of the assignment to Capgemini and Capgemini began making the payments prescribed by the Original Agreement to Riviera.

Shortly after Capgemini received notice of the Factoring Agreement, it also began receiving reports from contractors complaining that EC was not timely remitting payments to them.   When Capgemini raised this issue with EC, EC repeatedly assured Capgemini that payments to the contractors had been or would be made.

When contractors continued to lodge similar complaints with Capgemini during the late fall and early winter of 2009 Capgemini insisted on additional assurances from EC that the contractors would be paid.   Two months after EC and Riviera entered into the Factoring Agreement, on

-2-

December 2, 2009, EC and Capgemini entered into a letter agreement (the "Letter Agreement"), under which EC acknowledged its failure to make prompt payments to contractors and further agreed to release certain contractors from their agreements with EC so that Capgemini could arrange for these contractors to be paid through an alternative intermediary. The Letter Agreement further provided that EC would use any monies it received from Capgemini to pay Capgemini contractors. After the execution of the Letter Agreement, Capgemini continued to remit payments to Riviera under the terms of the Original Agreement as modified by the Factoring Agreement.

Despite the Letter Agreement, Capgemini continued to receive reports from contractors complaining of EC's failure to make payments. According to Capgemini procurement executive Arvind Kumar, EC informed some contractors that it failed to make timely payments because of Capgemini's failure to pay EC. Some contractors also threatened to sever their relationships with Capgemini. To avoid the loss of the services of valuable and knowledgeable contractors, Capgemini began making payments directly to contractors. In making such direct payments, Capgemini and an affiliated entity expended over $1.3 million. On December 18, 2009, Capgemini notified Riviera

-3-

that EC had failed to make payments to contractors and that Capgemini had begun to make direct payments to contractors in an effort to mitigate damages caused by EC's failure to make timely payments.

When Capgemini began paying contractors directly, it ceased paying Riviera.  Undisputed evidence – in the form of Riviera's Capgemini Account Statement appended to the Complaint – shows that Capgemini did not make $442,855.42 in outstanding payments to Riviera.

On March 18, 2010, Capgemini filed suit for breach of contract against EC in the Southern District of New York. (See Complaint, Capgemini U.S., LLC v. EC Manage, Inc. et al., No. 10 Civ. 2486, filed March 18, 2010 (Docket No. 1).)  EC, however, never appeared to defend itself in that litigation and, accordingly, the District Court entered default judgment in Capgemini's favor against EC.   (See Order, Capgemini U.S., LLC v. EC Manage, Inc. et al., No. 10 Civ. 2486, filed October 14, 2010 (Docket No. 14).) Riviera was not a party to that suit.

In this action, Riviera seeks to recover $442,855.42, which it asserts Capgemini owes under the Original Agreement as assigned to Riviera by the Factoring Agreement.

-4-

## II.   DISCUSSION

A.   STANDARD OF REVIEW

Pursuant to Rule 56, a court may grant summary judgment if, on the record before it, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Alabama v. North Carolina, 130 S. Ct. 2295, 2308 (2010). In determining whether disputed issues of material fact exist, a court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor. See, e.g., Shapiro v. New York Univ., 640 F. Supp. 2d 411, 418 (S.D.N.Y. 2009) (citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citations omitted). The moving party bears the burden of proving that no genuine issue of material fact exists, or that, because the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. See Gallo v.

-5-

Prudential Residential Servs., LP, 22 F.3d 1219, 1223-24 (2d Cir. 1994). When deciding cross-motions for summary judgment, the standard to be applied "is the same as that for individual motions for summary judgment and a court must consider each motion independent of the other." Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quotation omitted).

B.   ANALYSIS

Though it advances multiple legal theories, Capgemini's fundamental position is simple:   Because EC breached the Original Agreement, Capgemini owes nothing to Riviera.   Riviera's points of law are similarly branches emanating from a single trunk:   After Capgemini received notice of EC's assignment of payments under the Original Agreement to Riviera, EC's breach - and any attendant damages - is irrelevant to Riviera's claims for payment from Capgemini because such breach and damages did not arise from the transaction governed by the Original Agreement.

The parties agree that Uniform Commercial Code ("U.C.C.") § 9-404(a) (formerly § 9-318), which governs the "Rights Acquired by [an] Assignee[ and] Claims and Defenses Against [an] Assignee" in the context of secured

transactions, controls this dispute.  McKinney's U.C.C. §9-
404 (2011).  Section 9-404 reads, in relevant part:

> (a) . . . [T]he rights of an assignee are subject to:
>      (1)  all  terms  of  the  agreement  between  the
> account debtor and assignor and any defense or claim
> in recoupment arising from the transaction that gave
> rise to the contract; and
>      (2)  any other defense or claim of the account
> debtor against the assignor which accrues before the
> account  debtor  receives  a  notification  of  the
> assignment  authenticated  by  the  assignor  or  the
> assignee.

Id.  (emphasis added).[2]  In other words, Capgemini has two
circumscribed sets of claims or defenses in relation to
Riviera:  (1) those sounding in recoupment and related to
the transaction contemplated by the Original Agreement (see
id.  (a)(1)); and  (2)  those that Capgemini could assert
against EC and which arose prior to Capgemini's receipt of
the EC/Riviera notice of assignment (see id. (a)(2)).  See
Bank of America, N.A. v. Trinity Lighting, Inc., No. 10 C
2250, 2011 WL 3489693, at *2 (N.D. Ill. Aug. 9, 2011)
(describing "two types of claims and defenses" set forth in
"pellucid" § 9-404).

    As an initial matter, it is clear that Riviera cannot
be liable to Capgemini for EC's breach because "the U.C.C.
. . . distinguish[es] finance assignments from general
assignments."    GMAC  Commercial  Credit  LLC  v.  Springs

---

[2]    Here,  Capgemini  is  the  account  debtor,  EC  the
assignor, and Riviera the assignee.

Industries, Inc., 171 F. Supp. 2d 209, 214 (S.D.N.Y. 2001).

Finance assignments, such as the Factoring Agreement between EC and Riviera, "confer[] only the assignor's rights," and not the assignor's obligations under the assigned contract. Id. As such, Riviera was under no obligation to ensure EC's performance of its duties under the Original Agreement. Moreover, under the express language of § 9-404(b) and the antecedent case law codified therein, an account debtor cannot pursue affirmative relief against a financing assignee for the assignor's breach. See McKinney's U.C.C. §9-404(b) (2011); Michelin Tires (Canada) Ltd. v. First Nat. Bank of Boston, 666 F.2d 673, 677 (1st Cir. 1981) (rejecting "a construction of [§] 9-318 that would impose full contract liability on assignees of contract rights[ because u]nder this view, a bank taking an assignment of contract rights as security for a loan would also receive as 'security' a delegation of duties under the contract and the risk of being held liable on the contract in place of its borrower"); Trinity Lighting, 2011 WL 3489693, at *3-*4; Rosenthal & Rosenthal, Inc. v. John Kunstadt, Inc., 482 N.Y.S.2d 287, 288 (App. Div. 1st Dep't 1984) (reversing lower court holding that "[i]nasmuch as a defense of breach of contract may serve to defeat the claim of the assignor, it may also serve to defeat the claim of

-8-

the assignee[,]" because that holding ignored U.C.C. § 9-318). Because Capgemini cannot assert an action for breach of the Original Agreement against Riviera, Capgemini cannot invoke EC's breach to shield it from Riviera's claims. Rather, § 9-404(a) provides Capgemini with two specific sets of defenses it may assert against Riviera, as described above.

Capgemini argues that the costs it incurred in mitigating and preventing damages arising from EC's failure to timely pay contractors should be used as an offset against Riviera's claim for payments owed under the Original Agreement. However, it is undisputed that all of the costs borne by Capgemini in its effort to mitigate the deleterious effects of EC's breach occurred after it received notice of the Factoring Agreement. As such, Capgemini cannot advance these damages as a set-off under § 9-404(a)(2). See Finance One, Inc. v. Timely Textiles, Inc., No. 09 Civ. 4624, 2010 WL 882907, at *1 (S.D.N.Y. 2010) ("[U]nder [New York law,] 'defendant may not assert as against plaintiff any unrelated claim which defendant may have had against [assignor] unless it arose prior to the notice from [assignor] of the assignment of the account to plaintiff." (quoting Rosenthal & Rosenthal, 482 N.Y.S.2d at 288)). Accordingly, the Court need only examine in

depth the first type of defense available to Capgemini, recoupment as provided for in § 9-404(a)(1).

The pivotal question under § 9-404(a)(1) is whether Capgemini's claim for recoupment "ar[ose] from the transaction that gave rise to the contract." If so, Capgemini may recoup its damages against those claimed by Riviera. Capgemini bears the burden of establishing that its claim for recoupment arose from the Original Agreement. See Fleet Capital Corp. v. Yamaha Motor Corp. U.S.A., No. 01 Civ. 1047, 2002 WL 31174470, at *29 (S.D.N.Y. Sept. 26, 2002) (account debtor bears burden of establishing same transaction under U.C.C. § 9-404).

Capgemini and EC entered into two agreements relevant to this dispute, the Original Agreement and the Letter Agreement; Riviera was assigned rights only under the former. For purposes of determining Capgemini's defenses available against Riviera, then, the relevant transaction is that which gave rise to the Original Agreement. The Letter Agreement, though indisputably related to the commercial arrangement underlying the Original Agreement, represents a second, subsequent transaction between Capgemini and EC.

It was only after EC failed to live up to its commitment in the Letter Agreement that Capgemini incurred

the expenditures that it now seeks to recoup against
Riviera's claim. Several undisputed facts demonstrate that
Capgemini's costs were incurred only after EC's breach of
the Letter Agreement. First, the basic sequence of events
supports this conclusion: Capgemini did not expend funds
paying contractors directly after any initial breach of the
Original Agreement, but did so only after the Letter
Agreement failed to redress what appeared to be a
deteriorating situation. Second, the structure of the
Letter Agreement itself was designed to permit contractors
to re-work their relationships with Capgemini so as to
avoid relying upon EC. The costs Capgemini asserts as the
basis for recoupment were spent to accomplish precisely
this goal by creating a direct line of payment from
Capgemini to the contractors. Third, at deposition,
Capgemini's own employee admitted that no contractors were
lost due to EC's breach of the Original Agreement. (Docket
No. 14 Ex. B.) Fourth, in an affidavit submitted in
support of its motion for summary judgment, a Capgemini
executive described the danger of losing contractors as
stemming from EC's falsely informing contractors that
Capgemini was withholding payments owed to EC. According
to Capgemini, EC began misinforming contractors in this

-11-

damaging manner only after the execution of the Letter Agreement.  (See Docket No. 16, Ex. 3, ¶¶ 14-15.)

Finally, it must be noted that Capgemini is in possession of a default judgment against EC arising from the very events at issue here.  In that action, Capgemini seeks recovery of over a million dollars; Riviera points out - and Capgemini does not dispute - that any damages awarded in that litigation would be duplicative of the damages Capgemini here claims as the basis for its right to recoupment.    Using Capgemini's costs to balance out Riviera's claim while Capgemini is able to pursue damages from EC or its successors could effectively permit Capgemini a double recovery.

The undisputed facts show, then, that EC's breach of the Original Agreement did not cause any damage to Capgemini, but that all of its expenses - whether or not they are properly considered damages arising from a breach of contract or expenditures in pursuit of a "business decision" to pay contractors directly - were necessitated only by reason of EC's failure to abide by the Letter Agreement and EC's post-Letter Agreement statements to contractors.    As such, the mitigation costs Capgemini advances as the foundation of its recoupment defense cannot

-12-

be deemed to have arisen from the same transaction as that underlying the Original Agreement.

Capgemini argues that the "transaction" that gave rise to the Original Agreement should be viewed as inclusive of the entire series of events discussed in this litigation, including the Letter Agreement and Capgemini's efforts to mitigate damage to its relationships with contractors. See, e.g., Fleet Capital Corp., 2002 WL 31174470, at *30 ("Courts also have allowed offsets under § 9-318(1)(a) where separate contracts are so intertwined that they are effectively one agreement." (citations omitted)). The Original Agreement did, after all, structure the relationship between Capgemini, EC and the contractors, and it was the degeneration of that relationship that caused Capgemini to incur the costs it seeks to balance against Riviera's losses here. This broad interpretation of the "transaction" that gave rise to the Original Agreement is untenable.

It is inequitable and unwarranted practice to consider within the transaction that gave rise to the Original Agreement events that post-dated that agreement and which were the result of negotiations to which Riviera was not a party. The illogic of such a finding is evident from the fact that Riviera, to protect its assigned

interest in the Original Agreement, would then be forced to assure EC's performance of its obligations under not only the Original Agreement, but also under the subsequent Letter Agreement of which Riviera had no contemporary knowledge and to which it was not a party.  In practical terms, Capgemini would be able to reap the benefits of operating within a multi-party commercial arrangement - that is, its counterparty to the Original and Letter Agreements would be better financed through access to a third-party factor - while it retained significant bilateral leverage over that counterparty to affect alterations in the contours of the commercial relationship moving forward.   Section 9-404 is structured to avoid forcing a finance assignee into the role of guarantor as to the assignor's performance, and the provision creates a clear architecture for the relationship between an account debtor, assignor and finance assignee founded at the time that the assigned contract is formed.   Michelin Tires, 666 F.2d at 677 ("Under this view, a bank taking an assignment of contract rights . . . would also receive . . . a delegation of duties under the contract and the risk of being held liable on the contract in place of its borrower. We do not believe it was the intent of [§ 9-404] to create such a result.").   Capgemini's argument that its mitigation

costs arose from the transaction underlying the Original Agreement undermines these policies and threatens to chill the provision of beneficent factoring services.

Because the costs that Capgemini seeks to set against Riviera's claim did not arise from the transaction at issue in the Original Agreement, Capgemini cannot successfully invoke the defense of recoupment against Riviera under § 9-404(a)(1).  Accordingly, Riviera is entitled to judgment as a matter of law under § 9-404 as applied to the undisputed facts of this case.[3]

### III. ORDER

For the reasons set forth above, it is hereby

**ORDERED** that the motion (Docket No. 11) of plaintiff Riviera Finance of Texas, Inc. ("Riviera") is GRANTED; and it is further

**ORDERED** that the motion by endorsed letter (Docket No. 10) of defendant Capgemini U.S., LLC ("Capgemini") is DENIED; and it is further

**ORDERED** that Capgemini is liable to Riviera.  The Clerk of Court is directed to enter judgment, in the amount of $442,855.42, against Capgemini; and it is further

---

[3]     Because the Court finds that Riviera is entitled to judgment under § 9-404, it need not and does not reach Riviera's equitable estoppel claim.

**ORDERED** that the Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          30 March 2012

Victor Marrero
U.S.D.J.